**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROBERT HUNTER BIDEN, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:    23-2711  (RC) |
| | : | |
| v. | : | Re Document Nos.:    17, 22 |
| | : | |
| UNITED STATES INTERNAL | : | |
| REVENUE SERVICE, | : | |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION TO DISMISS;**

**DENYING INTERVENOR-DEFENDANTS' MOTION TO INTERVENE**

## I.  INTRODUCTION

Plaintiff Robert Hunter Biden sued the United States Internal Revenue Service ("IRS"), alleging that two IRS employees and their private attorneys unlawfully disclosed his confidential tax return information in violation of 26 U.S.C. § 6103.  Biden additionally alleges that the IRS failed to establish proper safeguards over that tax return information in violation of the Privacy Act, 5 U.S.C. § 552a.  Biden seeks declaratory judgment, compensatory and punitive damages, attorney's fees, and an order compelling the IRS to produce certain documents and adopt a security plan that satisfies the Privacy Act's requirements.  The IRS moves to dismiss the Privacy Act claim, Biden's non-monetary claims, and any compensatory damages claims arising from disclosures by the employees' private attorneys rather than the employees themselves.  The IRS employees additionally move to intervene in this lawsuit, both permissively and as of right, asserting that their interests will be impaired if Biden prevails in this case.

For the reasons stated below, the Court grants the IRS's motion to dismiss Biden's Privacy Act claim and any non-monetary claims for relief.  The Court concludes, however, that the IRS is liable for its employees' actions through their non-employee agents and denies the IRS's motion to dismiss Biden's unlawful disclosure claims.  Finally, the Court denies the employees' motion to intervene, concluding that they lack a sufficient stake in the outcome of this litigation to support intervention as of right and that permissive intervention would unduly prejudice the parties and add complexity to the litigation.

## II.  FACTUAL BACKGROUND

According to the allegations in the Amended Complaint, which the Court accepts as true at this stage of the litigation, two IRS agents—Gary Shapley and Joseph Ziegler—engaged in the "unauthorized public disclosure" of Biden's "confidential return information during more than 20 nationally televised and non-congressionally sanctioned interviews and numerous public statements" either personally or by directing legal counsel to make those appearances.  Am. Compl. ¶ 4, ECF No. 15.

On or about April 19, 2023, Shapley's lawyer "sent a letter" containing confidential return information "to various members of Congress," requesting that Shapley be afforded the opportunity to testify before congressional oversight committees.  *Id.* ¶ 21.  Various media outlets reported the letter on the same day, asserting that "the letter was referring to the investigation of Mr. Biden."  *Id.*  Around the same time, the attorney appeared on a podcast, where the host introduced him as representing "a new whistleblower raising concerns about political interference in the Hunter Biden investigation."  *Id.* ¶ 23.  During that interview, Shapley's lawyer discussed an investigation into an individual's tax compliance, leaving the identity of the individual "for others to put that together."  *Id.*  The attorney also appeared in an

interview on CBS News on behalf of Shapley, during which he further discussed the investigation, stating that "typical steps that a law enforcement investigator would take were compromised because of political considerations." *Id.* ¶ 24.  The lawyer additionally appeared on behalf of his client on Fox News the following day, where he discussed the attorney general's involvement in the investigation. *Id.* ¶ 25.  On or about May 24, 2023, Shapley himself appeared for an interview on CBS News, where he discussed the investigation, as well as "deviations in the investigative process." *Id.* ¶ 26.

In late May and early June 2023, Shapley and Ziegler testified before the United States House Committee on Ways and Means, during which the agents were informed that the interview remained "protected confidential information under Section 6103," and that disclosure of returns or return information was unlawful. *Id.* ¶¶ 7, 27, 29.  On June 22, 2023, the Committee voted to submit the protected documents to the House of Representatives and publicly released the transcript of the agents' testimony, as well as related exhibits. *Id.* ¶¶ 31–32.

The Amended Complaint alleges that following these hearings, the agents "proceeded to selectively and publicly disclose certain potentially sensitive aspects of Mr. Biden's confidential return information." *Id.* ¶¶ 29, 30.  On June 28, 2023, Shapley sat for an additional interview on Fox News, during which he discussed several aspects of the investigation, including messages sent and received by Biden, proposed execution of search warrants, and his belief that Biden should be charged with federal tax crimes. *Id.* ¶¶ 33–35.  Around the same time, Shapley further discussed the investigation on CBS News and a podcast, during which he asserted, among other things, "that Mr. Biden had not paid sufficient taxes from 2014 through 2019." *Id.* ¶¶ 36–37.

On July 19, 2023, the agents testified before the United States House Committee on Oversight and Accountability ("Oversight Committee") in a closed executive session. *Id.* ¶ 38.

The Amended Complaint alleges that the Oversight Committee had not been authorized, pursuant to the procedures found in § 6103(f), to receive confidential return information.  *Id.*

Biden alleges that between July 20 and August 11, 2023, the two IRS agents and their attorneys gave at least eight additional interviews to media outlets—including CNN, the Megyn Kelly Show, Fox News, and the John Solomon Reports podcast—during which they discussed confidential return information and the ongoing investigation.  *Id.* ¶¶ 39–46.  Details shared included internal recommendations regarding charging decisions, *see id.* ¶ 39, as well as Biden's deductions, delinquent taxes, and evidence of alleged tax evasion, *see id.* ¶ 42.  Biden asserts that the IRS agents provided information to their private attorneys "for the purpose of making such unauthorized disclosure[s]."  *Id.* ¶¶ 43–44.  He alleges that much of this information went beyond the scope of testimony provided to congressional committees.  *Id.* ¶ 45.  He further contends "[o]n information and belief" that the IRS never instructed the IRS agents to refrain from disclosing his confidential return information or took steps to prevent the disclosure.  *Id.* ¶ 47.  Finally, he asserts that he "did not request, authorize, or otherwise consent to this disclosure."  *Id.* ¶¶ 39, 40, 42–46.

Biden filed this lawsuit on September 18, 2023, *see* Compl., ECF No. 1, and filed the operative Amended Complaint on February 5, 2024, *see* Am. Compl.  The Government filed a partial motion to dismiss.  *See* Def.'s Mot. Dismiss, ECF No. 17.  On May 17, 2024, the IRS agents—Gary Shapley and Joseph Ziegler—moved to intervene in this action as defendants.  *See* Joint Mot. Intervene, ECF No. 22.  Biden and the Government oppose that motion to intervene.  *See* Pl.'s Opp'n Mot. Intervene, ECF No. 30; Def.'s Opp'n Mot. Intervene, ECF No. 29.

## III.  LEGAL STANDARDS

### A.  Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" by asking whether the plaintiff has properly stated a claim on which relief can be granted. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In deciding a motion to dismiss under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  However, a court may disregard "inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Kowal*, 16 F.3d at 1276).

To survive a motion to dismiss, a plaintiff must provide "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Id*. (citing *Twombly*, 550 U.S. at 555).  In deciding a 12(b)(6) motion, the Court may consider "only the facts alleged in the complaint [and] any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice," *Equal Empl. Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

**B.  Motion to Intervene as of Right**

"The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard."  *Hodgson v. United Mine Workers*, 473 F.2d 118, 130 (D.C. Cir. 1972).  Specifically, Rule 24(a) provides that:

> [o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

The D.C. Circuit has established that the right to intervene under Rule 24(a) depends on the applicant's ability to satisfy four factors: (1) whether the motion to intervene was timely; (2) whether the applicant claims an interest relating to the property or transaction that is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties.  *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (citations omitted); *see also Jones v. Prince George's Cty.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) (listing the four elements of Rule 24(a) as "timeliness, interest, impairment of interest, and adequacy of representation").  "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections."  *WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 9 (D.D.C. 2010) (quoting *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001)).

### C.  Motion for Permissive Intervention

A court may allow an applicant to intervene when it demonstrates (1) "on timely motion"

that it (2) "has a claim or defense that shares with the main action a common question of law or

fact."  Fed. R. Civ. P. 24(b)(1)(B).  When exercising its discretion to allow permissive

intervention, the Court also "must consider whether the intervention will unduly delay or

prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  "The D.C.

Circuit has adopted a flexible reading of Rule 24(b)'s 'claim or defense' language,' allowing

intervention even in 'situations where the existence of any nominate claim or defense is difficult

to find.'"  *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 274 F.R.D. 305, 312 (D.D.C.

2011) (internal quotation marks omitted) (quoting *Equal Emp. Opportunity Comm'n v. Nat'l*

*Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  "[P]ermissive intervention is an

inherently discretionary enterprise."  *Nat'l Children's Ctr., Inc.*, 146 F.3d at 1046 (citing

*Hodgson*, 473 F.2d at 125 n.36).  A party seeking permissive intervention must possess "an

independent basis for jurisdiction."  *Id.* at 1046.

### IV.  ANALYSIS

The Court first examines the IRS's partial motion to dismiss, concluding that Biden's

claims related to unlawful disclosure of return information survive.  The Privacy Act claims must

be dismissed, however, along with claims for non-monetary relief.  The Court next considers the

IRS agents' motion to intervene, determining that they may not intervene as of right and that

permissive intervention is not merited here.

### A.  Partial Motion to Dismiss

The Court first considers the IRS's arguments related to Biden's unlawful disclosure

claims before addressing the Privacy Act claims.

### 1. Unlawful Disclosure Claims

#### a. Unlawful Disclosure Statutes

"As a general rule, Title 26, Section 6103 of the United States Code makes tax returns and return information confidential unless their release is authorized by an exception enumerated in that same section." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 45 F.4th 324, 328 (D.C. Cir. 2022) (citing 26 U.S.C. § 6103(a)).  The statute mandates that

> Returns and return information shall be confidential, and except as authorized by this title . . . no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section.

26 U.S.C. § 6103(a)(3).  The statute defines "return information" to generally include:

> [1] a taxpayer's identity, [2] the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, [3] whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, [4] or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

*Id.* § 6103(b)(2)(A).  The statute defines "disclosure" as "the making known to any person in any manner whatever a return or return information."  *Id.* § 6103(b)(8).  The term "taxpayer identity" includes "the name of a person with respect to whom a return is filed."  *Id.* § 6103(b)(6).  Unless an enumerated exception applies, therefore, it is generally unlawful for an officer or employee of the United States to disclose identifiable information related to an individual's tax return to anyone.

"From 1920 until 1976, the United States government treated individual income tax information as a general government asset."  James N. Benedict & Leslie A. Lupert, *Federal*

*Income Tax Returns-The Tension Between Government Access and Confidentiality*, 64 Cornell L. Rev. 940, 941 (1979).  "[I]n the wake of Watergate and White House efforts to harass those on its 'enemies list,'" however, Congress passed the strict confidentiality requirements found in § 6103.  *Tax Analysts v. I.R.S.*, 117 F.3d 607, 611 (D.C. Cir. 1997); *see also* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976); Benedict & Lupert at 941–42 ("This fundamental change resulted in part from Watergate-related events in the 1970s where evidence was uncovered that President Nixon may have had income tax audits and investigations initiated and conducted in a discriminatory manner for purposes unrelated to the collection of taxes.").  A report prepared by the Joint Committee on Taxation explained that the "[r]easons for change" included the White House's acquisition of return information "pertaining to a number of well known individuals for non-tax purposes."  Joint Comm. on Taxation, JCS-33-76, General Explanation of the Tax Reform Act of 1976 at 314 (1976).  Sharing return information with other agencies raised privacy concerns, which could "seriously impair the effectiveness of our country's very successful voluntary assessment system, which is the mainstay of the Federal tax system."  *Id.*  Rather than allowing the Executive to control sensitive taxpayer records, "Congress undertook direct responsibility for determining the types and manner of permissible disclosures."  *In re U.S.*, 817 F.3d 953, 960 (6th Cir. 2016) (quoting Office of Tax Policy, *Taxpayer Confidentiality Provisions, Vol. I* at 22).

To give teeth to these confidentiality provisions, Congress increased the criminal penalties found in 26 U.S.C. § 7213 and added civil liability.  Unlawful disclosure of "any return or return information" by an officer or employee of the United States was rendered "a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of

not more than 5 years, or both."  Tax Reform Act of 1976 § 4102, 90 Stat. 1686.[1]  The 1976 Act

additionally created a civil cause of action against "any person" who "knowingly, or by reason of

negligence, discloses a return or return information," with the plaintiff entitled to "actual

damages" and—in the case of willful or grossly negligent disclosure—punitive damages of at

least "$1,000 with respect to each instance of such unauthorized disclosure."  *Id.* at 1687, 26

U.S.C. § 7217.

Six years later, Congress revised this statutory scheme again.  In the Tax Equity and

Fiscal Responsibility Act of 1982, Congress repealed the civil damages provision found in

§ 7217.[2]  *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 357, 96

Stat. 324, 646 (1982).  In its place, Congress enacted 26 U.S.C. § 7431, which creates two

separate causes of action for disclosures by federal employees and non-employees.  *See id.* at

645–46.  The provision states that where an "officer or employee of the United States"

unlawfully discloses a taxpayer's "return or return information," the taxpayer may bring a civil

action for damages "against the United States."  *Id.*; *see also* 26 U.S.C. § 7431(a)(1).  In contrast,

when a "person who is not an officer or employee of the United States" unlawfully discloses

protected information, the taxpayer may bring a civil action against "such person."  Tax Equity

and Fiscal Responsibility Act of 1982 § 357, 96 Stat. at 646; *see also* 26 U.S.C. § 7431(a)(2).

According to one analysis, "Congress believed that [the repealed] mechanism was unduly harsh

on federal employees who might suffer financial ruin if held responsible for a simple mistake

---

[1] The previous version of § 7213 provided for "not more than 1 year" of imprisonment
for disclosure of reproduced tax documents.  Technical Amendments Act of 1958, Pub. L. No.
85-866, § 90, 72 Stat. 1606, 1666 (1958).

[2] Congress later codified a different provision at 26 U.S.C. § 7217.  *See* Internal Revenue
Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 1105, 112 Stat. 711
(1998).

that resulted in unlawful disclosure."  Allan Karnes & Roger Lively, *Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information*, 23 Seton Hall L. Rev. 924, 931 (1993).

The Court approaches the case with this background, which indicates that Congress intended taxpayers' return information to be broadly protected from disclosure to prevent abuse by Executive officers and politicization of the voluntary assessment system.  The evolution of these statutes additionally demonstrates that Congress specifically decided that civil liability for federal employees' unlawful activity should lie against the federal government and not against the employees themselves.

### b.  Liability for Actions of Employees' Agents

Biden seeks compensatory and punitive damages for several alleged disclosures carried out by private attorneys working for Shapley and Ziegler.  *See* Am. Compl. ¶¶ 54, 60, 61.  The Government moves to dismiss these claims, asserting that the United States has not waived its sovereign immunity under § 7431(a) for unlawful disclosures made by individuals who are not employees of the United States.  Def.'s Mot. Dismiss at 9–11.  When a person is not an officer or employee of the United States, the Government argues, the taxpayer's remedy is against "such person," and not the United States.  *Id.* at 9.  Biden responds that § 6103 prohibits unauthorized disclosures "in any manner," that the IRS agents' initial disclosures to their attorneys were unauthorized, and that basic agency law principles render the IRS agents—and therefore the United States—liable for the actions of their attorneys.  Pl.'s Opp'n Mot. Dismiss at 7–12.  The Government replies that there is no need to apply agency law in this context because a taxpayer may sue the United States for the initial disclosure to an employee's agent.  Def.'s Reply at 5–7.  Biden and the IRS therefore agree that the Government is liable for any unlawful disclosures a

federal employee makes to his agent.[3]  They offer two alternative constructions of § 7431(a), however, regarding any disclosures those federal employees instructed their agents to make.  *See id.* at 3–7; Pl.'s Opp'n Mot. Dismiss at 9–11.  The Court agrees with Biden that the Government cannot escape liability for disclosures carried out by the agents of IRS employees.

The Court concludes that the lawyers' actions can be imputed to the IRS employees—and therefore the United States—under general principles of agency law.  "The Supreme Court has explained that, 'where a common-law principle is well established, . . . courts may take it as a given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.'"  *Allen v. Dist. Columbia,* 969 F.3d 397, 402 (D.C. Cir. 2020) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)); *see also Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021) (instructing similarly).  "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law."  *Id.* (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)).

It is hornbook law that "[p]rincipals are liable for the tortious acts of their agents."  *Burlington Ins. Co. v. Okie Dokie, Inc.*, 398 F. Supp. 2d 147, 156 (D.D.C. 2005) (citing *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982)), amended in part, 439 F. Supp. 2d 124 (D.D.C. 2006).  As the Restatement explains, "[a] principal is subject to direct liability to a third party harmed by an agent's conduct when . . . the agent acts with actual authority or the principal ratifies the agent's conduct" and "the agent's conduct, if that of the

---

[3] The Government asserts that Biden's Amended Complaint contains no allegation that the two IRS agents violated the law by initially disclosing confidential information to their attorneys.  Def.'s Reply at 6.  The Court does not interpret the Government to seek dismissal of those claims.  Rather, the Court points out that the "[f]ederal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014).

principal, would subject the principal to tort liability."  Restatement (Third) of Agency § 7.03 (Am. Law Inst. 2006).  When interpreting federal tort statutes, courts regularly "consult general principles of law, agency law, which form the background against which federal tort laws are enacted."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011) (citing *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–55 (1998)).

Courts have long interpreted the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, to incorporate these agency law principles without specific reference to them.  This is so even though courts have noted—in the context of the FTCA—that "an individual may not bring a tort claim against the federal government absent an explicit waiver by Congress."  *Davis v. United States,* 973 F. Supp. 2d 23, 28 (D.D.C. 2014) (citing *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994)).  In *Logue v. United States*, for instance, the Supreme Court considered whether an employee of a local jail that contracted with the Bureau of Prisons could be considered an "employee of the Government" under the Act.  412 U.S. 521, 524–26 (1973). The Court turned to "the modern common law as reflected in the Restatement of Agency," which "make[s] the distinction between the servant or agent relationship and that of independent contractor turn on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract."  *Id.* at 527.  Because the defendant federal employee did not control "the day-to-day operations of the contractor's facilities," *id.* at 529, the Court concluded that the local employee was not an employee of the federal government under the FTCA, *id.* at 532; *see also United States v. Orleans*, 425 U.S. 807, 813–19 (1976) (engaging in similar analysis); *Witt v. United States*, 462 F.2d 1261, 1263 (2d Cir. 1972) (explaining that the FTCA's "language was drafted to have an expansive reach and should be applied with an eye to general agency law") (citation omitted).  There is no reason to believe that similar common law

agency principles would not apply to the waiver of sovereign immunity found in § 7431(a), which reaches torts committed by federal employees with access to confidential return information.  This is particularly true given the broad scope Congress envisioned for these statutory mechanisms.  *See supra* Section IV.A.1.a.

Here, Biden alleges that the attorneys disclosed confidential return information at the "direction[]" of their clients, who were IRS employees at the time.  Am. Compl. ¶ 3; *see also* ¶¶ 4–6.  He contends that "[a]t all relevant times," each lawyer "acted as an authorized agent of" the IRS employees "and, therefore, had apparent and actual authority to act on [the IRS agents'] behalf."  *Id.* ¶¶ 18–19.  This makes sense, as "[o]rdinarily, a lawyer is a client's agent."  *In re Perle*, 725 F.3d 1023, 1027 (9th Cir. 2013).  And because "lawyers are agents," "[t]heir acts (good and bad alike) are attributed to the clients they represent."  *Johnson v. McBride*, 381 F.3d 587, 589 (7th Cir. 2004) (citing, among others, *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396–97 (1993)).  These allegations suffice to show that the lawyers possessed "actual authority" such that the IRS employees incur "direct liability" as principals for their tortious acts.  Restatement (Third) of Agency § 7.03 (Am. L. Inst. 2006).  This direct liability ultimately flows to the United States under § 7431(a).[4]

The Government argues that holding it liable for the acts of its employees' agents extends the statute beyond the United States's explicit waiver of sovereign immunity.  *See* Def.'s Mot. Dismiss at 9–11.  It is true, as the Government points out, *see id.* at 10, that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."  *Lane v. Pena*, 518 U.S. 187, 192 (1996).  To give effect to this requirement, "[a]ny

---

[4] Biden carries the burden, of course, to show that the lawyers acted as the agents of the two IRS employees.

ambiguities in the statutory language are to be construed in favor of immunity." *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012) (citing *United States v. Williams*, 514 U.S. 527, 531 (1995)).  Yet courts must still use "traditional interpretive tools" to determine "the scope of Congress' waiver." *Id.* at 291.  The Supreme Court deployed these principles in *Logue* when determining that agency principles applied to the waiver of sovereign immunity in the FTCA. 412 U.S. at 527–32; *see also Orleans*, 425 U.S. at 813–14 (applying the direct "control" test in the context of the FTCA's "limited waiver of sovereign immunity").  The Court does not find the statute here ambiguous, as Congress does not stray from common law norms—including basic tenets of agency law—unless it "'speak[s] directly' to the question addressed by the common law."[5] *Allen,* 969 F.3d at 402 (quoting *United States v. Texas,* 507 U.S. 104, 108 (1991)).  It would be strange indeed if Congress sought to prohibit federal employees from disseminating taxpayers' return information but implicitly withdrew a remedy when that disclosure is carried out by another at the direction of a federal employee.[6]

---

[5] There is no reason to believe, for example, that federal employees would have escaped liability for the actions of their agents under the mechanism Congress originally enacted in 1976. *See* 90 Stat. at 1687.  It would make little sense to construe the same exact language differently when Congress decides to assign the damages to the United States instead of the federal employee.  *See* 26 U.S.C. § 7431.

[6] The Government hints that Congress sought to funnel all claims against individuals who are not officers or employees of the United States through § 7431(a)(2), and that Biden's claims against the lawyers here must pass through that cause of action.  Def.'s Mot. Dismiss at 10–11.  As the Government appears to recognize, *see id.*, § 7431(a)(2) provides a cause of action only when the defendant was initially authorized to receive confidential information under § 6103. *See Stokwitz v. United States*, 831 F.2d 893, 896 (9th Cir. 1987); *Clode-Baker v. Cocke*, No. A-11-CV-977-LY, 2012 WL 1357023, at *2 (W.D. Tex. Apr. 16, 2012), *report and recommendation approved*, No. A-11-CV-977-LY, 2012 WL 3570713 (W.D. Tex. July 2, 2012); *Manning v. Haggerty*, No. 3:11CV302, 2011 WL 4527818, at *5 (M.D. Pa. Sept. 28, 2011). These entities might include state and local officials, *see* § 6103(d), or others with certain material interests, *see* § 6103(e).  The provision thus provides no presumption that damages arising from the actions of non-employees must, in all cases, be sought under § 7431(a)(1).

Even if the principles of agency law did not apply here, the Court concludes that the law—by its plain text—holds the United States liable for disclosures federal employees make through intermediaries.  Congress indicated that the statutory scheme should reach broadly and extend to disclosure "in any manner."  26 U.S.C. § 6103(b)(8); *see also* Pl.'s Opp'n Mot. Dismiss at 7, 9.  The Supreme Court has "repeatedly explained" that "the word 'any' has an expansive meaning."  *Patel v. Garland*, 596 U.S. 328, 338 (2022) (quoting *Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020)).  This Court must interpret the statute to reach a broad range of activity that results in the unlawful disclosure of confidential information.  The Government asserts that courts often construe this "in any manner" language "to describe the method [by which] a person who has access to return information conveys that information, *e.g.*, by email, orally, by fax, anonymously, and so on."  Def.'s Reply at 4 (citing *Payne v. United States*, 290 F. Supp. 2d 742, 751 (S.D. Tex. 2003); *Comyns v. United States*, 155 F. Supp. 2d 1344, 1349 (S.D. Fla. 2001)).  Yet even under the Government's conception of the provision, passing information through another person represents a method for disclosing confidential information.  Federal employees thus violate the plain text of the statute when they make unlawful disclosures through others.

The Court finally notes that the Government's construction of § 7431 would work against Congress's clear intent in passing strict limitations on the dissemination of taxpayer return information.  Congress acted to prevent abusive practices and defend taxpayers' faith in a system built on voluntary disclosure of sensitive personal information.  *See supra* Section IV.A.1.a. Interpreting the statutory scheme to allow for repeated disclosures by an agent working at the direction of a federal employee would tend to defeat that statutory scheme and undermine Congress's mandate that the federal government take its confidentiality obligations seriously.

For these reasons, too, the Court concludes that the statute must render the United States liable for the actions of its employees' agents.

### 2.  Privacy Act Claims

Biden also brings claims under the Privacy Act, asserting that the IRS failed to establish appropriate safeguards for his confidential return information.  Am. Compl. ¶¶ 62–68.  He seeks statutory damages under the Privacy Act, an order requiring the IRS to produce any documents related to disclosure of his confidential return information, and an order requiring the IRS to adopt a data security plan the satisfies the Privacy Act.  *Id.* at 27–28.  The IRS moves to dismiss these Privacy Act claims, contending that Biden has failed to allege that he suffered actual damages, that injunctive relief is not available in these circumstances, and that claims for non-monetary relief should be dismissed.  Def.'s Mot. Dismiss at 11–21.  Biden argues that his Privacy Act claim survives because the IRS ratified the agents' disclosures and he suffered actual damages.  Pl.'s Opp'n Mot. Dismiss at 14–19.  The Court concludes that Biden's Privacy Act claim must be dismissed.

The Privacy Act "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used."  *Henke v. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996) (quoting *Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984)); *see also Cooper*, 566 U.S. at 287 (noting the "comprehensive and detailed set of requirements" laid out in the Privacy Act to protect individuals' personal information).  The Privacy Act specifically prohibits disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another

agency" without the consent of "the individual to whom the record pertains" or other authorization under the Privacy Act. 5 U.S.C. § 552a(b).

When a federal agency "fails to comply" with a provision of the Privacy Act, an adversely affected individual may generally bring a civil action against the agency. *See id.* § 552a(g)(1)(D). The Privacy Act nonetheless limits the remedies available to a litigant. *Id.* § 552a(g)(4). When a plaintiff seeks damages, a court may award "actual damages sustained by the individual" that "in no case" shall be "less than the sum of $1,000." *Id.* § 552a(g)(4)(A). A court may also enter injunctive relief, but only in "specific situations." *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988). A court may order an agency to "amend" an "individual's record," 5 U.S.C. § 552a(g)(2)(A), or it "may enjoin the agency from withholding" certain records, *id.* § 552a(g)(3)(A).

The Supreme Court has explained that the Privacy Act waives the federal government's sovereign immunity only for "special damages for proven pecuniary loss." *Cooper*, 566 U.S. at 298; *see also In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 62 (D.C. Cir. 2019) (listing "actual damages" as one of three requirements to "unlock the Privacy Act's waiver of sovereign immunity"). "'Special damages' are limited to actual pecuniary loss, which must be specially pleaded and proved." *Cooper*, 566 U.S. at 295 (citing 1 D. Avery Haggard & Thomas M. Cooley, Treatise on the Law of Torts, or the Wrongs Which Arise Independently of Contract § 164, p. 580 (4th ed.1932)). As such, "[p]laintiffs must specifically allege that they have suffered calculable damages to survive [a] motion to dismiss." *Welborn v. Internal Revenue Serv.*, 218 F. Supp. 3d 64, 82 (D.D.C. 2016). Biden's Amended Complaint alleges that the IRS agents' conduct caused him "reputational[] and emotional[]" harm. Am. Compl. ¶ 10; *see also* Pl.'s Opp'n Mot. Dismiss at 18. These harms comprise "general damages," such that Biden's

complaint fails to state a claim for pecuniary relief under the Privacy Act.  *See Cooper*, 566 U.S. at 295–96 (describing "general damages" as "loss of reputation, shame, mortification, injury to the feelings and the like").

In opposition to the partial motion to dismiss, Biden additionally cites harassment of his family and friends, "loss of present and future financial opportunities, such as his inability to resume his practice of law," and the implications for his "right to a fair trial."   Pl.'s Opp'n Mot. Dismiss at 18–19.  But these alleged damages were not pleaded in the Amended Complaint.  A party may not amend his complaint through a brief in opposition to a motion to dismiss.  *See Pappas v. Dist. Columbia*, 513 F. Supp. 3d 64, 81 n.5 (D.D.C. 2021).  Even if these allegations were included in the Amended Complaint, as currently characterized they would nonetheless fail to state a claim for monetary relief.  Claims of "harassment" do not constitute calculable pecuniary damages, nor does alleged impingement on the right to a fair trial.  *See Welborn*, 218 F. Supp. 3d at 82.  Biden's references to "present and future financial opportunities," Pl.'s Opp'n Mot. Dismiss at 18, are similarly too vague and conclusory because they neither plead actual damages nor show precisely how they relate to the IRS agents' conduct.  Federal Rule of Civil Procedure 9(g) "requires that special damages be 'specifically stated,' i.e., the plaintiff must allege actual damages with 'particularity' and specify 'facts showing that such special damages were the natural and direct result' of the defendant's conduct."  *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002) (quoting *Fowler v. Curtis Pub. Co.*, 182 F.2d 377, 379 (D.C. Cir. 1950)).  Neither the Amended Complaint nor the opposition to the motion to dismiss contains any description of the amount of the damages or how the IRS agents' actions caused those damages.  Because Biden does not specially plead actual damages, his claims do not fit within the Privacy Act's waiver of sovereign immunity.

Biden similarly fails to state a claim for any form of declaratory or injunctive relief under the Privacy Act.  He seeks an order compelling "the IRS to formulate, adopt, and implement a data security plan that satisfies the requirements of the Privacy Act."  Am. Compl. at 28.  He also asserts that "the IRS should have a procedure to promptly remove investigative files from the possession of compromised agents in order to prevent unauthorized disclosures."  Pl.'s Opp'n Mot. Dismiss at 16 (citing *Doe v. Dep't of Justice*, 660 F. Supp. 2d 31, 43 (D.D.C. 2009)).  The D.C. Circuit has explained that by authorizing courts to enter injunctive relief in certain situations, "the Act precludes other forms of declaratory and injunctive relief."  *Doe*, 851 F.2d at 1463 (citing *Hastings v. Jud. Conf. of the U.S.*, 770 F.2d 1093, 1104 (D.C. Cir. 1985)).  In particular, because Biden raises his claims under the catch-all provision, § 552a(g)(1)(D), "only monetary damages, not declaratory or injunctive relief, are available to" him,  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).  Biden, for his part, does not challenge the IRS's assertion that declaratory and injunctive relief are unavailable.  *See* Pl.'s Opp'n Mot. Dismiss at 14–19.  "When a plaintiff fails to address arguments made in a motion to dismiss, the Court may treat those arguments as conceded."  *Dawn J. Bennett Holding, LLC v. FedEx TechConnect, Inc.*, 217 F. Supp. 3d 79, 82 (D.D.C. 2016), *aff'd*, No. 16-7144, 2017 WL 2373115 (D.C. Cir. Apr. 4, 2017) (citing D.D.C. Local R. 7(b)).[7]

For these reasons, the Court concludes that it must dismiss Biden's Privacy Act claims. The Amended Complaint fails to specially plead actual damages in a manner that would fit

---

[7] Biden seeks documents related to the alleged unlawful disclosure of his confidential return information.  *See* Am. Compl. at 28.  The Privacy Act does allow a court to "order the production to the complainant of any agency records improperly withheld from him."  5 U.S.C. § 552a(g)(3)(A).  Again, Biden does not argue that this injunctive relief is available to him.  In addition, as the IRS points out, *see* Def.'s Mot. Dismiss at 13 n.4, there is no indication that Biden ever requested access to the relevant records, a prerequisite to a claim that agency records have been improperly withheld, *see* 5 U.S.C. § 552a(d).

within the Act's waiver of sovereign immunity.  In addition, the Privacy Act does not provide for the declaratory or injunctive relief Biden seeks here.  As such, the only remaining claims in this case relate to alleged unlawful disclosure of confidential return information under 26 U.S.C. §§ 6103, 7431 and any pecuniary damages arising from those violations.

### B.  Motion to Intervene

The IRS agents—Shapley and Ziegler—move to intervene in this case and to file a motion to dismiss.  *See* Joint Mot. Intervene; Intervenors' Proposed Mot. Dismiss, ECF No. 22-1.  They argue in that proposed motion to dismiss, among other things, that their alleged actions were lawful under whistleblower protections found within 26 U.S.C. § 6103(f), Intervenors' Proposed Mot. Dismiss at 8–12; that any disclosures to Congress were lawful, *id.* at 9–12; and that Biden's confidential return information had entered the public domain at the time any disclosures may have taken place, *id.* at 16–31.  The agents seek to intervene as of right under Federal Rule of Civil Procedure 24(a).  *See* Joint Mot. Intervene at 6–17.  In the alternative, they seek permissive intervention under Federal Rule of Civil Procedure 24(b).  *Id.* at 17–19.  The Court addresses each of these grounds for intervention in turn.

#### 1.  Intervention as of Right

The IRS agents assert that they may intervene as of right under Rule 24(a)(2) because their motion is timely, *see* Joint Mot. Intervene at 6–8, because they have a strong interest in defending their protected whistleblower status, *id.* at 8–14, and because the IRS will not adequately protect their interest in this proceeding, *id.* at 14–17.  Both Biden and the IRS oppose intervention, asserting that the IRS agents lack standing and a sufficient interest in this litigation to support intervention.  *See* Pl.'s Opp'n Joint Mot. Intervene at 3–6; Def.'s Opp'n Joint Mot.

Intervene at 5–10.  The Court agrees with the parties that the IRS agents do not have a legally
protected interest in the outcome of this litigation.

To intervene as of right, a litigant must "claim[] an interest relating to the property or
transaction that is the subject of the action."  Fed. R. Civ. P. 24(a)(2); *see also Fund for Animals*,
322 F.3d at 731.  This provision "look[s] to the 'practical consequences' of denying
intervention."  *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (quoting
*Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967)).  "To be protected by means of
intervention, the interest must be 'a legal interest as distinguished from interests of a general and
indefinite character.'"  *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1292 (D.C. Cir.
1980) (quoting *Radford Iron Co. v. Appalachian Elec. Power Co.,* 62 F.2d 940, 942 (4th Cir.
1933)).  In addition, "[i]ntervenors become full-blown parties to litigation, and so all would-be
intervenors must demonstrate Article III standing."[8]  *Old Dominion Elec. Coop. v. Fed. Energy
Reg. Comm'n*, 892 F.3d 1223, 1232 (D.C. Cir. 2018) (citing *Fund for Animals*, 322 F.3d at 732–
733 (D.C. Cir. 2003)).

---

[8] Courts in this circuit generally treat the standing analysis for intervention as of right as
equivalent to determining whether the intervenor has a "legally protected" interest under Rule
24(a).  *See, e.g.*, *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1018 (D.C. Cir. 2003)
("Article III's 'gloss' on Rule 24 requires an intervenor to have a 'legally protectable' interest."
(quoting *S. Christian Leadership Conf. v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984)));
*Wildearth Guardians*, 272 F.R.D. at 13 n.5 ("[W]hen a putative intervenor has a 'legally
protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and
vice versa."); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003)
("With respect to intervention as of right in the district court, the matter of standing may be
purely academic.").

The IRS agents assert that they may not need Article III standing to participate in this
case.  *See* Joint Mot. Intervene at 8 (discussing *Town of Chester v. Laroe Estates, Inc.*, 581 U.S.
433 (2017)).  The D.C. Circuit has stated that *Town of Chester* "does not cast doubt upon, let
alone eviscerate, our settled precedent that all intervenors must demonstrate Article III standing."
*Old Dominion*, 892 F.3d 1223 n.2.  Even if *Town of Chester* did upset that settled precedent, the
Court's conclusion would remain the same based on its evaluation of the IRS agents' interest
under Rule 24(a)(2).

The Court starts by observing that the subject matter of this case has narrowed to whether the IRS agents violated provisions of 26 U.S.C. § 6103, and whether the United States must compensate Biden for any disclosure of his confidential return information.  26 U.S.C. § 7431(a)(1) solely contemplates civil liability, and the IRS agents have no legally protected interest in whether the United States compensates Biden, nor do they claim one.  *See generally* Joint Mot. Intervene.  As discussed above, Congress repealed the provision that would have rendered federal employees personally liable and, in its place, enacted a statute that makes the United States liable for any pecuniary damages.  *See supra* Section IV.A.1.a.  In this sense, the damages provision operates like an official-capacity claim under 42 U.S.C. § 1983, in which the "the real party in interest . . . is the governmental entity."  *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The IRS agents would therefore suffer no financial or other tangible injury as a direct result of an adverse judgment against the United States in this case.  *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury'").  The Court thus disagrees with the IRS agents' assertion that they "are the real subject" of this lawsuit.  Joint Mot. Intervene at 6.  The real subject of this controversy is the United States's liability under 26 U.S.C. § 7431(a)(1), and resolution of that dispute will have no direct impact on the intervenors' legally protected financial or property interests.

In addition, several of the IRS agents' concerns about "adverse collateral consequences" instead sound in issue preclusion.  Joint Mot. Intervene at 11.  "Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim."  *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001).  The IRS agents naturally do not want this litigation to affect those

future proceedings without their participation.  They cite "pending complaints pursuant to 5 U.S.C. § 2302 where they have alleged the IRS engaged in prohibited personnel practices in reprisal for substantially the same whistleblowing activity and subject matter at the core of this litigation."  Joint Mot. Intervene at 11.  They note "other types of serious retaliation for their actions, including investigation and potential criminal prosecution by the Department of Justice and the Treasury Inspector General for Tax Administration."  *Id.* at 13.  The Court also takes judicial notice of a defamation lawsuit Shapley and Ziegler recently filed, in which they claim that one of Biden's attorneys engaged in defamation by commenting that they disclosed confidential return information in violation of 26 U.S.C. § 6103.  *See* Complaint, *Shapley v. Lowell*, No. 24-cv-2646 (Sept. 13, 2024).

As a formal matter, there is no risk that an adverse judgment against the United States in this case would collaterally estop the IRS agents in a future retaliation lawsuit against the United States, future criminal proceedings, or their defamation lawsuit.  Issue preclusion generally does not apply to a party that was not party to the first action.  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Although there are limited exceptions to this rule, none of them would apply here.  *See id.* at 893–95 (describing six exceptions).  The United States would therefore be unable, for instance, to rely on defensive nonmutual collateral estoppel in any retaliation lawsuit.  In addition, "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel."  *Dowling v. United States*, 493 U.S. 342, 349 (1990) (quoting *One Lot Emerald Cut Stones & One Ring v. United States*, 490 U.S. 232, 235 (1972)).

The risk of collateral estoppel here does not create an interest supporting intervention as of right under Rule 24(a).[9]

The Court must nonetheless consider whether the IRS agents advance any other cognizable interest that this action may affect.  It is true that in order to prevail, Biden must demonstrate that the IRS agents violated certain provisions of 26 U.S.C. § 6103.  Apart from any effects on other potential litigation, Shapley and Ziegler assert that the lawsuit could impact their risk of criminal prosecution, the course of their careers, and their reputations.  *See* Joint Mot. Intervene at 11–12.  Yet the IRS agents do not demonstrate that those consequences would flow from the outcome of this lawsuit rather than the underlying conduct in which they allegedly engaged.  These harms are additionally speculative and represent "[a]llegations of *possible* future injury," rather than "*certainly impending*" injury.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The IRS agents' asserted belief that they may already be under investigation undercuts the argument that their risk of criminal prosecution depends on the outcome of this lawsuit.  *See* Joint Mot. Intervene at 13.  It is also not clear how this civil suit would influence the risk of prosecution, as the government's "decision whether to prosecute turns on factors such as 'the strength of the case, the prosecution's general deterrence value, the [g]overnment's enforcement priorities, and the case's relationship to the [g]overnment's overall enforcement

---

[9] If anything, intervening as defendants in this lawsuit would increase the IRS agents' risk of collateral estoppel in other actions, as any unfavorable ruling in this Court could allow another party to apply defensive nonmutual collateral estoppel against them.  *See United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984) ("Defensive use of collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against the same or a different party.").

plan.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  Effects on the agents' careers are also difficult to trace, particularly given that "Shapley and Ziegler are still employed by [the] IRS."  Pl.'s Opp'n Joint Mot. Intervene at 6; *see also* Joint Mot. Intervene at 1 (describing the two as IRS agents in the present tense).  In addition, the agents would be entitled to due process in any action to remove them from their respective positions.  *See* Def.'s Opp'n Joint Mot. Intervene at 7 (citing *Vestal v. Dep't of Treasury*, 1 F.4th 1049, 1051 (Fed. Cir. 2021)).

The final question is whether the IRS agents have a legally protected interest in their reputations that may be prejudiced by this litigation.  They cite several cases for the general proposition that reputational injury "can constitute a cognizable injury sufficient for Article III standing."  Reply in Support of Mot. Intervene at 2, ECF No. 32 (quoting *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003)); *see also id.* at 10.  Yet these cases relate to reputational harm outside the courthouse doors, in contexts where either the Constitution or another legal principle protects an individual from the injury.  *Foretich*, for instance, considered reputational injury arising from a child custody statute that the court determined was an unconstitutional bill of attainder.  351 F.3d at 1203, 1207.  The "constitutional liberty interest in one's reputation," Reply in Support of Mot. Intervene at 10 (quoting *Strickland v. United States*, 32 F.4th 311, 353 (4th Cir. 2022)), arises from the Fifth Amendment Due Process Clause and is nonetheless insufficient without alteration of the individual's "status as a matter of state law," *Paul v. Davis*, 424 U.S. 693, 708 (1976) (establishing the so-called "stigma-plus test").  In contrast, it is not apparent that a party has a protected legal interest in the reputational impact of events that occur within the courthouse doors.  There exists, for example, an absolute privilege for publication of defamatory matter during judicial proceedings.  *See* Restatement (Second) of

Torts § 586–88 (Am. L. Inst. 1977).  The Court thus concludes that bare reputational concerns do not create an interest supporting intervention as of right.

It is true, as the IRS agents argue, that the Court must evaluate whether intervenors would be affected "in a practical sense" by the determination of the action.  Joint Mot. Intervene at 14; Reply in Support of Mot. Intervene at 9.  Yet the practical effects of the litigation must still impact a legally protected interest, such as a regulated entity's right to challenge unlawful regulations.  *See Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015) (separately considering the existence of "a legally protected interest" and whether that interest is impeded "as a practical matter").  In *Castle*, for example, the D.C. Circuit concluded that several companies had an interest in the Environmental Protection Agency's settlement with environmental groups that required the agency to establish a series of regulations related to pollution.  561 F.2d at 906–07, 909–911.  The intervening companies had "particular, separate interests in the regulation" of their own industries, as well as an "overlapping interest in the promulgation of a body of valid regulations."  *Id.* at 911.  The court observed that although the companies could later challenge the regulations, their interests as regulated entities would be impaired by deferring participation until after the regulations were enacted.  *Id.* at 909–11.  Key to that case was the intervenors' protected interest in the subject matter of the controversy that they could later pursue.  Based on the forgoing, the Court determines that the IRS agents lack this legally protected interest in the reputational aspects of this litigation.  Because the Court can find no such protected "interest relating to the property or transaction that is the subject of the action," Fed. R. Civ. P. 24(a)(2), it concludes that the IRS agents may not intervene in this litigation as of right.

2. Permissive Intervention

The IRS agents additionally seek permissive intervention.  *See* Joint Mot. Intervene at

17–19.  They claim to assert an "actual defense shared by the proposed intervenor and the

defendant" and state that intervention at this stage would cause no delay or prejudice.  *Id.* at 18.

Biden opposes permissive intervention, contending that "Proposed Intervenors' conduct makes it

clear that they intend to turn this lawsuit into a circus, starring themselves."  Pl.'s Opp'n Mot.

Intervene at 7.  The IRS states that intervention would cause unnecessary delay and allow the

"Proposed Intervenors to inject irrelevant issues into this case."  Def.'s Opp'n Mot. Intervene at

11.  The Court finds permissive intervention unwarranted here.

Permissive intervention is an "'inherently discretionary enterprise,' and the court enjoys

considerable latitude under Rule 24(b)."  *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10

(D.D.C. 2007) (quoting *Equal Emp. Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d

1042, 1046–48 (D.C. Cir. 1998)).  In exercising that discretion, courts weigh three factors set out

by Rule 24(b): (1) whether the motion to intervene is timely; (2) whether the applicant's claim

shares a question of law or fact in common with the main action; and (3) whether intervention

will unduly delay or prejudice adjudication of the original parties' rights.  See Fed. R. Civ. P.

24(b); *Sierra Club v. McCarthy*, 308 F.R.D. 9, 12 (D.D.C. 2015); *In re Vitamins Antitrust Litig.*,

No. Misc. 99-197, 2001 WL 34088808, at \*2 (D.D.C. Mar. 19, 2001).  Based on these three

factors, a court can deny a motion for permissive intervention—even if there is a common

question of law of fact—if intervention would cause undue delay, complexity, or confusion in a

case.  *See* Fed. R. Civ. P. 24(b)(3); *see also Sec. & Exch. Comm'n v. Everest Mgmt. Corp.*, 475

F.2d 1236, 1240 (2d Cir. 1972) ("[T]he complicating effect of the additional issues and the

additional parties outweighs any advantage of a single disposition of the common issues."); *Love*

*v. Vilsack*, 304 F.R.D. 85, 89 (D.D.C. 2014) (holding organization's thirteen-year delay in moving to intervene to seek injunctive relief precluded permissive intervention).

The parties agree that the motion to intervene is timely.  *See* Pl.'s Opp'n Mot. Intervene at 7; Def.'s Opp'n Mot. Intervene at 10.  Even assuming that the agents' defense shares a question of law or fact with the present action, the Court concludes that permitting the IRS agents to intervene in this matter would risk confusion of the issues and prejudice the current parties to the case.  The Court credits both parties' strong opposition to the intervention and perceived impacts on the litigation.  The Government argues that the agents simply "disagree with the United States' litigation strategy," Def.'s Opp'n Mot. Intervene at 11, and that it "is the only party at risk for liability to Plaintiff under § 7431(a)(1)," *id.* at 13.  Again, Congress deliberately created this structure, under which the United States is the real party in interest here. *See supra* Section IV.A.1.a.

The Court additionally finds that the IRS agents' intervention would add undue complexity to the case.  *See* Fed. R. Civ. P. 24(b)(3).  The IRS agents make plain that they hope to exercise control over the conduct of discovery—including other parties' discovery and depositions.  *See, e.g.*, Reply in Support of Mot. Intervene at 4.  The Court concludes that this would unnecessarily complicate discovery that, at present, already promises to be unusually complex because it will likely implicate lawyers, Congress, and news organizations.  For these reasons, the Court denies the IRS agents' motion to intervene permissively.

## V.  CONCLUSION

For the foregoing reasons, the IRS's Partial Motion to Dismiss (ECF No. 17) is **GRANTED IN PART** as to Biden's Privacy Act claims and claims for injunctive and

declaratory relief **AND DENIED IN PART** as to Biden's claims for damages under 26 U.S.C.

§§ 6103 and 7431; and it is

   **FURTHER ORDERED** that Shapley and Ziegler's Joint Motion to Intervene (ECF No.

22) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  September 27, 2024        RUDOLPH CONTRERAS
                United States District Judge